IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

DEBRA L. BERANEK,                      )
                                       )          8:06CV26
                  Plaintiff,           )
                                       )
       v.                              )
                                       )     MEMORANDUM AND ORDER
SOCIAL SECURITY ADMINISTRATION,        )
                                       )
                  Defendant.           )
_____    )


       Debra L. Beranek ("Beranek") filed an application for disability and disability

insurance benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq.*, on July

19, 2002. T62.[1]  The Social Security Administration ("SSA") denied Beranek's application

on November 20, 2002.  T42.  On December 16, 2002, Beranek filed a request for

reconsideration with the SSA, and on February 28, 2003, the SSA upheld its application

denial.  T46; T47.  On March 21, 2003, Beranek filed a request for hearing by an

administrative law judge ("ALJ").  T51.  The hearing commenced on March 10, 2004, and

ALJ Peter F. Belli found Beranek not disabled under the Act.  T55; T21.  The Appeals

Council denied Beranek's request for review on August 20, 2004.  T4.  I have reviewed the

record, the ALJ's evaluation and findings, the medical evidence, the parties' briefs, the

transcript, and the applicable law.  I conclude the ALJ's finding that Beranek is not disabled

---

[1]Beranek filed applications for supplemental security income and disability insurance benefits on
February 21, 2001.  The Social Security Administration denied her application and affirmed the denial on
reconsideration on May 8, 2001.  Beranek withdrew her claim before a hearing with an ALJ occurred, and the
ALJ in this case determined that only the period before May 9, 2001, is administratively final.  Beranek does
not contest this determination.  Filing No. 12.

within the meaning of the Act is not supported by substantial evidence on the record as a whole.

**Legal Standard**

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  A claimant is disabled when the claimant is "not only unable to do his previous work but cannot, considering . . . his age, education and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy . . . either in the region in which such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

An ALJ evaluates a disability claim according to a five-step sequential analysis prescribed by Social Security regulations. The ALJ examines:

> any current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience.  *See* 20 C.F.R. § 404.1520(a); *Braswell v. Heckler*, 733 F.2d 531, 533 (8th Cir. 1984).  If a claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience.  *See Braswell*, 733 F.2d at 533.  If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and second, that other such work exists in substantial numbers in the national economy.  *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).  A claimant's residual functional capacity is a medical question.  *See Id.* at 858.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000).

2

When reviewing the decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole. *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996). Under this standard, substantial evidence means something "less than a preponderance" of the evidence, *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998), but "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord Ellison v. Sullivan*, 921 F.2d 816, 818 (8th Cir.1990). "Substantial evidence is that which a reasonable mind would find as adequate to support the ALJ's decision." *Brown v. Chater*, 87 F.3d 963, 964 (8th Cir. 1996) (citing *Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir. 1996)).

In determining whether the evidence in the record as a whole is substantial, the court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). If the court finds that the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision because the record also contains substantial evidence that supports a different outcome or because the court would have decided the case differently. *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001).

Error exists when an ALJ fails to consider or discuss a treating physician's opinion that a claimant is disabled when the record contains no contradictory medical opinion. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). "[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in the record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (*quoting* 20 C.F.R. § 404.1527(d)(2) (2006). The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

To assist an ALJ making a disability determination, a vocational expert ("VE") is many times asked a hypothetical question to help the ALJ determine whether a sufficient number of jobs exist in the national economy that can be performed by a person with a similar RFC to the claimant. A hypothetical question is properly formulated if it incorporates impairments "supported by substantial evidence in the record and accepted as true by the ALJ." *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) (citing *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)). "[A] vocational expert's responses to hypothetical questions posed by an ALJ constitutes substantial evidence only where such questions precisely set forth all of the claimant's physical and mental impairments." *Wagoner v. Bowen*, 646 F. Supp. 1258, 1264 (W.D. Mo. 1986) (citing *McMillian v. Schweiker*, 697 F.2d 215, 221 (8th Cir.1983)). Courts apply a harmless error analysis during judicial review of administrative decisions that are in part based on hypothetical questions. For judicial review of the denial of Social Security benefits, an error is harmless when the outcome of the case would be unchanged even if the error had not occurred. *See Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003).

**Discussion**

    **A.    Treating Physician Assessment and Background**

4

Beranek, born on September 18, 1969, is currently 37 years of age.  She is 5'7" and weighed two-hundred-thirty pounds at the time of her application.  T67.  Beranek has completed high school, and her previous work experience includes jobs as an assistant cook, clerk, dietary aid, day care provider, and machine operator. T81. Beranek has been unable to work since November 10, 2000, the date Beranek allegedly became disabled. T62.  Beranek alleges disability due to bilateral hand pain, reflex sympathetic dystrophy ("RSD") of the hands, Raynaud's, arthritis, and depression.  T68.

Beranek presented at Heartland Orthopaedic & Sports Medicine Clinic on October 24, 2000, with bilateral hand pain. T252.  Beranek claimed she had the hand pain for ten years.  *Id.*  Dr. Christopher Ihle, M.D. ("Ihle") examined Beranek and concluded she had Phalen's signs, bilateral Tinel's, bilateral pressure sign, decreased sensation in her thumb, index, and long fingers of both hands.  *Id.*  Ihle assessed Beranek with bilateral carpal tunnel syndrome and ordered an EMG nerve conduction study to determine the severity of her median nerve involvement.  *Id.*

Beranek saw Dr. Manjula Tella, M.D. ("Tella") for nerve conduction velocity of both her upper extremities on November 6, 2000.  T172.  Tella conducted an EMG exam that revealed neuropathic changes in both the thenar muscles innervated by the median.  *Id.* According to the responses, Tella concluded that Beranek's median motor response was delayed on both sides, and median sensory response was absent on the right.  *Id.*  Tella noted the presence of moderately severe bilateral carpal tunnel syndrome, somewhat greater on the right side, and normal ulnar response at the wrist, across Beranek's elbow. *Id.*  Tella further reported that Beranek showed normal radial responses bilaterally.  T173. Tella gave Beranek samples of Foltrex to take daily.  *Id.*

5

The next day, November 7, 2000, Beranek met with Ihle to review her EMG nerve conduction studies.  T251.  Ihle noted splinting had not helped Beranek and decided to proceed with "carpal tunnel release."  *Id.*  On November 13, 2000, Beranek underwent an operation for her right carpal tunnel syndrome.  T168.  Ihle performed the surgery and found a "very thickened transverse metacarpal ligament especially the distal one-half. There is a large fibrosis and thickened fibrous type tissue in the carpal tunnel."  T168.  On December 4, 2000, Ihle conducted surgery on Beranek for her left carpal tunnel syndrome. T166; 151.  Ihle continued to treat Beranek post-operatively.  *See* T241-250.

Ihle referred Beranek to occupational therapy following her bilateral carpal tunnel surgeries, with orders to be seen three times a week for two to three weeks.  T150; 151. On December 13, 2000, wearing bilateral Velcro wrist splints, Beranek saw Lynn Hagedorn ("Hagedorn"), Occupational Therapist and Certified Hand Therapist, at the Occupational Therapy Department at Freemont Area Medical Center.  T150.  According to Beranek, she removed the right splint at home while performing light activities.  *Id.*  Beranek reported that she wore the left splint continuously per her physician's orders.  *Id.*  Beranek stated that she began seeing Ihle on October 3, 2000, for bilateral carpal tunnel syndrome.  T151.

Beranek conducted a pain assessment form and reported the quality of her pain as stabbing/sharp and pressing/tight.  T153.  Further, Beranek checked the boxes labeled "sometimes" in response to questions whether she had trouble falling asleep and whether she was awakened by pain.  *Id.*  Beranek also completed a questionnaire on her ability to perform activities.  T159.  On this questionnaire, Beranek circled the severe difficulty category choice for writing, turning a key, pushing open a heavy door, making a bed, and carrying a shopping bag or briefcase.  *Id.*  Beranek circled the "unable" category choice for

6

opening a tight or new jar, preparing a meal, placing an object above her head, doing heavy household chores, garden or yardwork, carrying a heavy (over ten pounds) object, changing an overhead lightbulb, and washing or blow drying her hair. *Id.* Beranek received instructions on scar tissue and scar massage exercises, with the recommendation to perform exercises ten times each, five times a day. T157.

On December 20, 2000, Beranek saw Hagedorn and complained of pain in the area of the scar on her right hand. T147. Hagedorn instructed Beranek to remove her right splint whenever possible to begin initiating functional activity. *Id.* Beranek reported that she performed her exercises on a daily basis. *Id.* Hagedorn noted that Beranek appeared to protect her right hand and limit her activity. *Id.* Hagedorn stated that Beranek would benefit from continued occupational therapy for modalities to decrease pain and stiffness, as well as improve range of motion. *Id.* On January 4, 2001, Hagedorn reported that Beranek reported less pain and increased functional use of her hands. T140. According to Hagedorn's summary of this meeting, Beranek complained of tingling at the distal tips of her right hand, excluding her thumb. *Id.* Hagedorn noted that Beranek continued to make "functional progress." *Id.* Further, Hagedorn noted that Beranek's left hand was progressing faster than her right, Beranek's range of motion had nearly doubled, and her strength was improving steadily. *Id.* Hagedorn wrote to Ihle on January 5, 2001, reporting that Beranek had undergone ten occupational therapy sessions since initiating treatment on December 13, 2000. T137. Hagedorn recommended continued therapy, as well as physical therapy because Beranek complained of tingling and paresthesia. T138.

Hagedorn continued to see Beranek three times a week, and on January 24, 2001, Hagedorn saw Beranek and noted that Beranek continued to have difficulty lifting, although

Beranek reported using her hands more at home.  T131.  Hagedorn stated that Beranek was progressing well toward her goals.  *Id.*  Hagedorn saw Beranek on February 2, 2001, and found that Beranek had less tenderness in the bilateral carpal tunnel incision areas. T127.  Hagedorn observed that Beranek had made excellent gains in the past few weeks, reported less pain and paresthesia, and improved ability to complete activities of daily living tasks.  *Id.*  Hagedorn recommended discontinuation of active occupational therapy, but recommended continued home exercises to improve strength and function bilaterally.  *Id.*

Beranek also saw Tella post-operatively and again in 2001 for re-evaluation.  T175. On March 3, 2001, Ihle referred Beranek to physician Matthew J. Magnino ("Magnino"), MD, regarding Beranek's complaints of burning pain in her hands.  T240.  In a letter to Ihle, Magnino noted that Tella concurred with an early diagnosis of RSD, bilaterally, and started sympathetic blocks, beginning with a series of lidocaine Bier blocks ("SLBB").  *Id.* Beranek's relief following the Bier block was fifty to sixty percent after two days.  *Id.* Beranek received a second SLBB on February 21, 2001, with seventy percent overall relief after two days, and a third SLBB on February 23, 2001, with excellent relief for five days. *Id.*  Beranek experienced a slow regression of pain, but not to the original baseline.  *Id.* On March 5, 2001, Beranek underwent re-evaluation and exhibited a noticeable decrease in temperature of both hands with a bluish discoloration.  *Id.*

Beranek received a fourth SLBB on that date and started bilateral therapy March 6, 2001.  *Id.*  Beranek exhibited normal color and warmer hands following therapy, and Magnino noted that this was an unusual response for RSD, especially in an untreated hand.  *Id.*  Beranek also had flushed cheeks, bilaterally, and Drs. Hawthrone and Raikar visited with Magnino and concurred that Beranek did not likely have early RSD, but

8

possibly a CREST syndrome or lupus. *Id.* Magnino directed Beranek to follow-up with Dr. Sears. *Id.*

Dr. Sears ("Sears") met with Beranek on March 9, 2001, and observed that Beranek's hands showed excellent pedal pulses bilaterally and appeared normal. T198. Beranek's wrists appeared to be tender to movement, but Sears did not find any heat or swelling. *Id.* Sears diagnosed possible Raynaud's syndrome with persistent arthritis and stopped Beranek's Neurontin, as Beranek stated it did not help her. *Id.* Beranek reported taking Pamelor, an antidepressant, birth control pills, and Relafen, that Sears switched to Lodine. *Id.* Sears also treated Beranek with Covera and Lodine. *Id.* Sears doubted Beranek had RSD, but speculated about lupus because Beranek had a facial rash. *Id.*

In April 2001, Ihle examined Beranek and noted that the burning pain in Beranek's hands had greatly subsided. T239. Ihle attributed the reduction in pain to the medications Sears prescribed, rather than Magnino's work. *Id.* Ihle noted Beranek had full range of motion of her wrists, improved Raynaud's, and resolving RSD. *Id.* Ihle stated that no further treatment was necessary and Beranek should be re-evaluated in six months. *Id.* Ihle again saw Beranek on October 2, 2001, for follow-up of her bilateral carpal tunnel releases. T235. Beranek reported that her hands felt "achy," especially in cold weather. *Id.* Beranek claimed warm soaks helped her hands, and that she no longer had numbness in her hands. *Id.* According to Beranek, she could not mow the lawn for more than twenty minutes because the vibrations hurt her hands, and she could not garden for longer than twenty minutes. *Id.* Ihle conducted a NEUROMetrix exam and noted Beranek had normal median nerve on her right; her left hand still had median nerve neuropathy signs with

slowing.  T236.  Ihle expressed concern that Beranek had RSD as well as some residual median neuropathy.  *Id.*

On October 16, 2001, Beranek presented complaining of pain with pulling motions, like opening a pop bottle.  T231.  Ihle noted that Beranek had been taking Prednisone and Vioxx, and that Beranek had "horrible pains" in her left arm below the elbow all the way down to just below her wrist, as well as her left shoulder.  *Id.*  Beranek stated that the pain was not constant and the Prednisone therapy helped the pain.  *Id.*

Ihle completed a Residual Functional Capacity ("RFC") disability form on November 13, 2001, and included a letter reporting that Beranek suffered from RSD of the hands, aggravated by repetitive type work.  T227.  Furthermore, Ihle stated Beranek would have this condition through her lifetime and that she needed to avoid repetitive activities with her hands to prevent reoccurrence.  *Id.*  According to Ihle, Beranek was limited in what she could do with her upper extremities, and that prolonged typing and even housework could aggravate her hands.  *Id.*  Ihle claimed that Beranek could not do repetitive line work in a manufacturing company.  *Id.*

On the RFC form, Ihle checked the boxes labeled "occasionally" for the categories of zero to five pounds, and five to ten pounds, that Beranek could lift.  T228.  Ihle checked "never" next to the boxes for ten to twenty pounds and greater.  *Id.*  For the amount Beranek could carry, Ihle checked the "occasionally" boxes for zero to five, five to ten, and ten to twenty pounds.  *Id.*  Ihle marked "frequently" for the following activities Beranek could perform: stooping, kneeling, reaching, crouching, and crawling.  *Id.*  According to Ihle, Beranek could reach above shoulder level occasionally.  *Id.*  For the section of the form

labeled "grasping," Ihle checked "no" next to the right hand and left hand.  *Id.*  Ihle also checked "no" for pushing and pulling, but "yes" for fine manipulations.  *Id.*

On November 29, 2001, Beranek applied for services with Nebraska Vocational Rehabilitation Services, reporting ongoing problems with arthritis, Raynaud's Disease, and RSD.  T123; T101.  Nebraska Vocational Rehabilitation Services wrote Beranek on July 19, 2002, reporting that they closed her case because Beranek's case was "'too severe' to benefit from Voc Rehab Services."  *Id.*  In this letter, Nebraska Vocational Rehabilitation Services mentioned Ihle's recommendation that Beranek not perform any repetitive pinching, or gripping type activities such as cutting with scissors, or use of hand held tools.  *Id.*; T220.  Nebraska Vocational Rehabilitation Services also stated that Physical Therapist Kris Johnk ("Johnk") provided a recommendation that Beranek perform duties at the light physical demand level, limiting any prolonged grasping and pace of fine motor control performance.  *Id.*; T199.

On March 22, 2002,  Ihle saw Beranek following a bone densitometry examination that revealed low bone density in Beranek's lumbar spine with normal bone mineral density of her left hip.  T224.  Ihle advised Beranek to continue with a calcium supplement with Vitamin D and refilled Beranek's Covera prescription.  T223.  On June 10, 2002, Beranek presented reporting continued pain in her hands with weather changes, and pain after having cut twenty pictures with scissors the prior evening.  T222.  Ihle noted that Beranek took Fosamax, Vioxx, Covera, Zoloft, and Prednisone.  *Id.*  Ihle found that Beranek had a negative Tinel's sign and negative Phalen's test on both wrists.  *Id.*

On June 12, 2002, Beranek presented at a Methodist Health system outpatient facility for an upper endoscopy after complaining of chronic heartburn.  T205.   Dr. Tyron

Alli ("Alli"), MD diagnosed Beranek with gastritis and a hiatus hernia. *Id.* Beranek presented again for an esophageal manometry and twenty-four hour PH probe on June 27, 2002. T203. Alli noted that Beranek had severe reflux for the last nine years. *Id.* Alli found Beranek experienced normal motility with the exception of a decreased lower esophageal sphincter and no acid exposure in her esophagus. T204.

Beranek saw Ihle on July 1, 2002, for follow-up of her bilateral RSD and bilateral carpal tunnel syndrome. T219. Ihle reviewed Beranek's RFC and stated that "[Beranek] has very little that she is going to be able to do in the workforce and most likely would be better off on permanent disability." *Id.* Beranek reported pain in her left arm above her elbow, and tenderness in both carpal tunnel areas. *Id.* Additionally, Beranek stated she had not taken Lortab since her last visit, and Ihle recommended a follow-up in three months, and a follow-up in January for her osteoporosis. *Id.*

On July 9, 2002, Beranek presented at a Methodist Health system outpatient facility complaining of heartburn. T202. Alli conducted an upper GI that showed normal distal esophageal motility. *Id.* Alli noted the existence of a moderate sized sliding type hiatal hernia. *Id.* Alli further found Beranek's stomach and duodenum appeared normal. *Id.* On July 26, 2002, Alli saw Beranek for a gastric emptying evaluation and abdominal pain. T201. Alli noted that Beranek's gastric emptying in Beranek's upper limits appeared normal. *Id.*

Beranek underwent a psychological examination on September 23, 2002, with Clinical Psychologist Edward Dale ("Dale"). T210. Dale noted that Beranek had a multitude of problems growing up with a lot of fighting within her family. *Id.* Beranek's father died when she was fifteen years old. *Id.* Dale stated that Beranek's physical

12

problems limited her social life, and she spent her time watching television because she had difficulty holding books.  *Id.*  Beranek reported to Dale that she "waited too long" to have her wrist and arm pain corrected, and that she felt pain after her surgery and her hands always hurt.  T211.  Beranek claimed that she regularly dropped things and had trouble gripping items.  *Id.*  Beranek further reported being depressed and generally unhappy.  *Id.*  She described feeling frustrated and angry about her life situation and financial problems.  *Id.*  Beranek also stated she had difficulty sleeping due to pain, and trouble "get[ting] comfortable."  *Id.*  Beranek told Dale that she had gained a significant amount of weight in the previous two years that caused her problems, and she craved chocolate.  T212.

Dale determined that Beranek appeared to be an individual with co-dependent type traits as she related and interacted with people.  *Id.*  According to Dale, Beranek's physical complaints and depression affected her ability to function independently.  *Id.*  Dale found that Beranek has generally been "fairly chronically depressed."  *Id.*  Further, Dale listed his prognosis as "guarded," noting that Beranek did not respond well to depression medication. *Id.*

Beranek saw Ihle on September 30, 2002, for her RSD.  T216.  Beranek reported continued pain in her hands with weather changes, and that she used Tylenol for extreme pain.  *Id.*  Beranek continued to take Prednisone, Vioxx, Zoloft, and Covera.  *Id.*  Ihle observed normal motion in Beranek's shoulders, elbows, wrists, and hand, with some pain in her elbows and wrist.  *Id.*  Ihle conducted a grip test and recommended Beranek engage in an exercise program.  *Id.*  Beranek presented again on March 10, 2003, and Ihle found that she had good range of motion of her wrists.  T347.  Ihle noted that Beranek is "off the

Covera right now and this is related to her Raynaud's phenomenon." *Id.* Ihle recommended that Beranek wear gloves during the cold days. *Id.* Beranek told Ihle she suspected she might be pregnant, and that she had an appointment with her gynecologist. *Id.*

Beranek presented on July 14, 2003, complaining of swelling, especially with heavy activities. T348. Ihle assessed Beranek with "[r]eflex sympathetic dystrophy, controlled." On November 3, 2003, Beranek presented complaining of burning pain in her left arm, and some numbness in the thumb, index, and long fingers. T351. Ihle found positive Phalen's sign and pressure sign in her left wrist, normal rotator cuff strength, normal deltoid strength, normal range of motion in the elbow, and normal bicep and tricep strength. T352. Ihle diagnosed possible early recurrent RSD in Beranek's left arm, possibly triggered by mild carpal tunnel syndrome. *Id.* Beranek saw Ihle on December 3, 2003, stating her pain had improved with the medication Ultram. T355. Ihle conducted a grip test and found normal range of motion and early RSD controlled by Ultram and Vioxx. *Id.*

## B.    DDS Physician Findings

Dr. Jerry Reed ("Reed"), MD, completed a physical RFC assessment on November 13, 2002. T260-70. Reed found that Beranek could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand, walk, and sit for about six hours in an eight-hour workday, and engage in limited pushing and pulling in her upper extremities. T261. Reed noted that Beranek should avoid concentrated exposure to extreme heat, wetness, humidity, noise, fumes, odors and gases, as well as hazards like machinery and heights. T264. Reed checked the boxes labeled "avoid even moderate exposure" for extreme cold and vibration. *Id.* In reviewing Beranek's medical record, he noted that

Beranek appeared to be mostly credible, although inconsistencies existed about her pain levels. T268. Reed stated that RSD is difficult to diagnosis, and confusion existed about Beranek's exact diagnosis. T269.

Included in the court's review of the record is a psychiatric review technique form, dated February 20, 2003, in which a box is checked that Beranek has impairments that are not severe. T295. The court finds the only legible name on this form is "Lee," presumably a DDS physician. *See Id.*

Dr. Glen D. Knosp ("Knosp"), MD, completed a physical residual functional capacity assessment for Beranek dated February 28, 2003. T309-16. Knosp found that Beranek could lift twenty pounds occasionally, ten pounds frequently, and she could stand, walk, and sit for six hours in an eight-hour workday. T310. Additionally, Knosp determined that Beranek was limited in her upper extremities in the category of pushing and pulling, and she could not do repetitive, sustained grasping. *Id.* Knosp checked the boxes labeled "occasionally" for the following activities Beranek could engage in: climbing, balancing, stooping, kneeling, crouching, and crawling. T311. However, Beranek could never climb ladders, ropes, or scaffolds. *Id.* Knosp checked the box labeled "unlimited" for whether Beranek could reach in all directions, including overhead. T312. In regard to handling (gross manipulation) and fingering (fine manipulation), Knosp checked the boxes labeled "limited." *Id.* Knosp found that Beranek should avoid concentrated exposure to extreme cold, heat, humidity, and vibration. T313. Knosp further found Beranek could have unlimited exposure to wetness and noise. *Id.* Knosp determined that inconsistencies existed in the record, and the severity of Beranek's allegations remained unsupported by

the evidence on file.  T316.  Knosp stated that Beranek was only partially credible, and appeared capable of work activity as outlined above.  *Id.*

### C.    Hearing and Vocational Expert

The ALJ conducted a hearing on March 10, 2004.  T389.  At the hearing, Beranek testified that she lived with her husband and two children in Cedar Bluffs, Nebraska.  T394.  Beranek testified that she had completed high school, she last worked in 2000, and she volunteered one hour, one day a week at a movie theater taking tickets.  T395-96.  For volunteering at the movie theater, Beranek stated that she and her family received free movie passes.  T396.  Beranek reported last working as an assistant cook at a school, as a bread store clerk and cashier, and at a hospital kitchen.  T396-97.  Beranek previously worked as a daycare attendant, and worked at Hormel's as a machine operator.  T398.  At the date of the hearing, Beranek weighed one-hundred ninety-five pounds, quit smoking twelve years previously, and occasionally consumed alcoholic beverages.  T401-02.

Beranek reported taking Vioxx, Tramedol, Estrostep, and asoflex.  T402.  Beranek told the ALJ she had arthritis, RSD, a hiatal hernia, gastritis, and that she was not currently under the care of a psychiatrist or psychologist.  *Id.*  Further, Beranek testified that she had difficulties with her left upper extremity, and that her doctor believed carpal tunnel had returned to her arm.  T410.  Beranek said that she did not use a cane, crutch, wheelchair, or walker, or wear any type of brace.  *Id.*  Beranek stated that she could drive, attend her children's school functions, dress herself, button her clothes with some difficulty, groom and feed herself, cook for her family, and do the laundry.  T405-07.  Beranek further stated that she could make her bed, vacuum and sweep with some difficulty, and frequent the grocery store, although her children pushed the cart.  T407-08.  Beranek claimed that

because she lived in the country, she had a lot of gravel, dirt, and dust enter her home from open windows.  T420.  As such, Beranek maintained that she could not keep up with the cleaning.  T420-21.  Beranek alleged that she had to take frequent breaks while cleaning her home, and so it usually took her all day to clean.  T411.

Beranek described pain in her left arm as a stabbing pain that wakes her in the night. T409.  Additionally, Beranek stated she had pain in her fingers, and sometimes pain that went all the way up her arm and into her shoulder.  *Id.*  Beranek noted that her pain worsened with activity, especially those activities that required gripping.  T413. Additionally, Beranek reported having difficulty reaching overhead or over her shoulder level because she experienced numbness and shooting pains.  T415.  Beranek claimed that sometimes her hands would become ice cold and "hurt to the bone." T413.  Beranek stated that the pain made it difficult to concentrate, pay attention to her work, or complete tasks.  *Id.*  To alleviate the pain, Beranek testified she would put her hands in hot water and put a heating pad on her hands.  T414.

In regard to her pain medications, Beranek said that she experienced sleepiness as a side-effect, as well as occasional dizziness.  *Id.*  Beranek reported that she took a twenty-minute nap every day, and that she could stand and sit for about an hour at a time.  T415, 416.  Further, Beranek claimed to have problems with vibrations, abnormal hair and nail growth, and her skin usually felt cold.  T416-17.  When asked about receiving the Bier blocks, Beranek stated that the treatment helped, but that the pain never really left.  T418.

Beranek testified that she could not shovel walks, garden and can food like she used to, and could no longer bowl.  T419.  Additionally, Beranek could no longer sit her children on her lap, read, embroider, ride with her children on the three-wheelers, or hold

17

a pen for a long period of time.  T419-20.  Beranek noted that she attended church once a month or every two months for an hour each time.  *Id.*  Beranek stated that she had lost fifty-five pounds since she started walking, and she could usually walk for about a mile. T420, 416.  Beranek testified that her life had changed since the onset of her diseases, and that she "wish[ed] [she] could just take a handful of pills and just end it because of the pain and [her lifestyle change]."  T420.  Beranek stated she did not do so because of her "two beautiful girls."  *Id.*  Beranek claimed that she felt worthless and lazy from not working, because she had worked since she turned fourteen years old.  T421.

Vocational Expert George A. Meyers ("Meyers") testified at the administrative hearing regarding Beranek's vocational history.  *Id.*  Meyers classified Beranek's prior work history as follows: assistant cook, semi-skilled; cashier, light, unskilled; stock clerk, medium, semi-skilled; dining room attendant, medium, unskilled; home child care provider, medium, semi-skilled; and machine operator, medium, semi-skilled.  T421-22.  The ALJ posed a hypothetical question to Meyers, and asked him to assume the following: an individual similar to Beranek, thirty-four years of age, and a high school graduate; the ability to carry, lift, push and/or pull twenty pounds occasionally, and ten pounds frequently; the ability to sit for eight hours in an eight hour workday, normal breaks provided; the ability to stand and walk for eight hours in an eight hour workday, normal breaks provided; no climbing on ladders, scaffolding, ropes; no working around dangerous machinery, unprotected heights, or exposure to extreme temperatures; and limited to occasionally working above the shoulder, occasional grasping (gross manipulation), pushing and pulling and fine manipulation.  T422-23.

18

Additionally, the ALJ stated that the hypothetical individual's ability to understand, remember, and carry out short, simple instructions was slightly limited. T423. The person's ability to receive, understand, remember and carry out detailed job instructions was moderately limited. *Id.* The ALJ described the person's ability to make judgments on simple, work-related decisions as slightly limited. *Id.* Further, the person's ability to make judgments on a detailed work limitation was moderately limited. *Id.* The ALJ did not impose any limitations on the person's ability to interact with the public. *Id.* The person's ability to interact with supervisors and coworkers was slightly limited, and the ability to respond appropriately to work pressures in a usual work setting was moderately limited. *Id.* Finally, the person's ability to respond appropriately to changes in a routine work setting was moderately limited. *Id.*

Meyers testified that a person with these hypothetical limitations would be able to perform jobs in the national economy. *Id.* Meyers provided the ALJ with three examples: entertainment or amusement park attendant, with 900 jobs in the regional economy; interview clerk, with 2,000 jobs in the regional economy; and counter clerk, with 1,000 jobs in the regional economy. T423-25. Meyers classified these jobs as light and unskilled. T424. Beranek's attorney then posed his own hypothetical to Meyers. T425. The attorney asked Meyers to assume an individual that could not perform any repetitive pinching or gripping-type activities, like using hand-held scissors, pliers or other tools. *Id.* The attorney asked Meyers to assume that this hypothetical person's treating physician recommended that the hypothetical person consider permanent disability. *Id.* Additionally, the attorney stated that this hypothetical person could not stand or sit for more than one hour, or lift no more than ten pounds. T426. The hypothetical also included the limitation that the

19

hypothetical person suffered from constant pain that interfered with the person's concentration and ability to pay attention and complete tasks.  *Id.*  In response to the attorney's hypothetical, Meyers testified that this hypothetical person could not perform any work, including any past relevant work.  *Id.*  Meyers' reasoning for this determination was "inaudible" according to the transcript of this hearing.  *Id.*

### D.   ALJ's Findings

Based on the medical evidence, the ALJ found that Beranek has RSD, a hernia, and gastritis.  T27.  The ALJ further noted Beranek's impairments are "severe" within the meaning of the regulations, but that Beranek did not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*  The ALJ specifically considered the requirements for musculoskeletal impairments, and determined that Beranek's gastritis did not meet the requirements for digestive system impairments.  *Id.*  The ALJ referenced Beranek's allegations of hand pain due to recurrrent RSD, Raynaud's syndrome, arthritis, and depression.  *Id.*  However, the ALJ determined Beranek's statements regarding her impairments were not entirely credible because discrepancies existed between Beranek's assertions and information contained in the reports of her treating and examining practitioners.  *Id.*  Specifically, the ALJ refers to Beranek's statements about her pain level to the SSA, and the inconsistent medical treatment records which describe her condition as resolving, "mild," and controlled.  *Id.*

The ALJ accorded great weight to the DDS physicians who reviewed Beranek's medical history and determined Beranek could perform light work with limited manipulation. T29.  The ALJ noted the second DDS physician who reached similar conclusions as the first DDS physician, found Beranek could not perform repetitive, sustained grasping and

20

would need to avoid exposure to extreme cold or heat, humidity, vibration and hazards such as machinery or heights. *Id.* According to the ALJ, the DDS physicians' determinations more closely comport with Beranek's treatment records. *Id.*

In response to the Nebraska Department of Education Vocational Rehabilitation ("Department") finding that Beranek's claims were "too severe" to benefit from vocational rehabilitation services, the ALJ noted the Department made its determination based on Beranek's subjective reports of difficulty driving and carrying a tray of food. *Id.* The ALJ appropriated less weight to the Department because it based its opinion on Beranek's subjective reports, because it was not made by an acceptable medical source, and because findings regarding the severity of the claimant's conditions are reserved for the Commissioner. *Id.* The ALJ also appropriated less weight to the physical therapist's opinion that Beranek could perform light work that does not require prolonged heavy grasping and permits fine motor control of her hands at a limited pace, because physical therapists are not an acceptable medical source under the Act. T30.

The ALJ determined Beranek's following RFC: Beranek can lift, carry, push, or pull twenty pounds occasionally or ten pounds frequently; Beranek can sit or stand/walk for six hours each in an eight-hour workday if she is given normal breaks; she cannot climb ladders, ropes, or scaffolds; Beranek can occasionally work above the shoulder level; she can occasionally grasp (gross manipulation), push, pull or perform fine manipulation; Beranek cannot work around unprotected dangerous machinery or at unprotected heights; she cannot work where exposed to extreme temperatures or above normal levels of odors or gases; and Beranek's ability to carry out, understand, or perform detailed instructions is limited. *Id.*

Furthermore, the ALJ noted Beranek has moderate difficulty understanding and remembering detailed instructions. *Id.* According to the ALJ, Beranek has a moderately difficult time making judgments on detailed work-related decisions, responding appropriately to changes in a routine work setting, and slight difficulties remembering and understanding short, simple instructions, carrying those instructions out, and interacting appropriately with coworkers and supervisors. *Id.*

Based on these determinations and Beranek's RFC, the ALJ evaluated whether Beranek could perform any past relevant work. *Id.* The ALJ noted that past relevant work must have been performed within the last fifteen years, and have lasted long enough for the claimant to learn to do the job to meet the definition of substantial gainful activity. *Id.* The ALJ found that Beranek meets the nondisability requirements for a period of disability and disability insurance benefits through the date of the ALJ's decision, and that Beranek has not engaged in substantial gainful activity since the alleged onset of her disability. The ALJ referenced Meyers' testimony that Beranek's past relevant work constituted semi-skilled to skilled work. *Id.* The ALJ concluded that because of Beranek's pain, Beranek no longer had a RFC capacity to perform semi-skilled to skilled work. T30-31. Thus, the ALJ determined Beranek is not qualified to return to her past relevant work. T31.

The ALJ stated that the burden shifted to the SSA to establish the existence of other jobs in significant numbers in the national economy that Beranek could perform, consistent with her RFC, education, work experience, and age. *Id.* Noting that Beranek is a younger individual and has a high school education, the ALJ found that Beranek does not have any transferrable skills from her semi-skilled previous work. *Id.* Using the Medical-Vocational Guidelines as a framework, the ALJ determined that Beranek is capable of performing a

22

significant range of light work as defined in 20 C.F.R. § 404.1567. *Id.* The ALJ defined light work as involving lifting of no more than twenty pounds at a time; frequent lifting or carrying of ten pounds; and a good deal of standing or walking. *Id.* Additionally, the ALJ stated that a person with the ability to do substantially all of these activities would be considered to perform a full or wide range of light work, and some sedentary work, absent limiting factors such as loss of fine dexterity or the inability to sit for long periods. *Id.*

The ALJ adopted Meyers' testimony that if Beranek assumed the hypothetical individual's work restrictions, Beranek is capable of making a vocational adjustment to other work. T31-32. The ALJ rejected the hypothetical question posed by Beranek's attorney as not supported by the record and not specific enough. *Id.* Accordingly, the ALJ determined that Beranek retains the capacity for work that exists in significant numbers in the national economy, and that Beranek is not "disabled" within the meaning of the Act. T32. The ALJ adopted Meyers' findings that there are a number of jobs in the national economy that Beranek can perform, including an entertainment or amusement park attendant, with 1,500 such jobs in Nebraska and the surrounding area; an interview clerk, with 2,000 such jobs; and a counter clerk, with 1,000 such jobs. T33.

Beranek appeals the ALJ's findings, arguing that Beranek's combined mental and physical limitations render Beranek disabled. Filing No. 12. Further, Beranek argues the ALJ relied on vocational expert testimony that contradicts the Dictionary of Occupational Titles ("DOT"), and thereby failed to prove that other work existed that Beranek could perform. *Id.* Specifically, Beranek maintains that Meyers offered only general job descriptions and did not provide DOT numbers. *Id.* Beranek argues the ALJ also failed to consider the fluid nature of Beranek's RSD, and temporary periods of improvement

23

should not preclude a finding of disability.  *Id.*  Beranek asks this court to reverse the ALJ's

findings and remand for a calculation of benefits.  *Id.*  Alternatively, Beranek requests that

this court reverse the ALJ's findings and remand for a proper evaluation of Beranek's RSD

and consideration of a closed period of disability.  *Id.*

In response, the SSA argues reversal is not required because the ALJ did not

inquire into the vocational expert's findings as it related to the DOT.  Filing No. 15.  Rather,

the SSA contends that a conflict between Meyers' testimony and the DOT does not exist,

and that this court should review the agency's determination according to the prejudicial

error rule.  *Id.*  The SSA maintains the prejudicial error doctrine is applied to Social Security

disability cases where the evidence is sufficient to support the ALJ's decision,  in spite of

the ALJ's error.  *Id.*  As such, the SSA argues that any failure of the ALJ to inquire of

Meyers whether any conflict existed between Meyers' testimony and the DOT constituted

harmless error, and that other substantial evidence exists supporting the ALJ's decision.

*Id.*

**Conclusion**

The court recognizes that Social Security Ruling 00-4p (*see* 2000 WL 1898704)

requires that an ALJ resolve apparent conflicts between the DOT and a VE's testimony "by

determining if the explanation given by the VE . . . is reasonable and provides a basis for

relying on the VE . . . testimony rather than on the DOT information."  SSR 00-4p, 2000 WL

1898704.  Here, Beranek's complaint with Meyers' finding that Beranek is qualified to

perform work as an interview clerk, is that "interview clerk" is a type of job, rather than a

specific job title, and the DOT includes twenty-four types of interview clerks.  *See* Filing No.

12, Attachment 1, Appendix Selected Characteristics of DOT Occupations.  Beranek

contends that "Election Clerk" is the only "interview clerk" position in the DOT Beranek can perform, given that the ALJ asked the expert for work that could be done by someone limited to occasionally working above the shoulder, and only occasional grasping (gross manipulation), pushing and pulling and fine manipulation.  Filing No. 12.  The court agrees with Beranek, and notes that the strength, skill level, handling, and fingering distinctions vary with the type of interview clerk.  *Id.*

Given the limitations imposed by the ALJ, Beranek further counters that "Character Impersonator" is the only position she can perform under the "entertainment or amusement park attendant" type of job, and that Meyers failed to specify whether Beranek could perform the position "Counter Clerk" or whether Meyers was referencing this job type generally.  It is not clear to this court whether Meyers' statements about the jobs that exist in the regional economy are consistent with the limitations imposed by the ALJ in his hypothetical question.

Further, this court is unsure whether the DOT's requirements include reaching above shoulder level, and this is the type of inconsistency the ALJ should have resolved with Meyers' expertise.  After a review of the record, this court cannot determine whether Meyers' testimony and the ALJ's findings regarding the availability and quantity of jobs Beranek can perform in the regional economy is consistent with the DOT.  The court defers to an ALJ's decision if it is supported by substantial evidence in the record as a whole, but here, a potential unresolved inconsistency exists that needs to be resolved.  Therefore, this court remands the ALJ's decision in this case for a determination of whether the jobs identified by Meyers are, in fact, consistent with the definitions in the DOT and Beranek's limitations.

ACCORDINGLY, IT IS ORDERED that this case is remanded to the ALJ for further findings concerning whether Beranek is able to engage in any other kind of substantial gainful work which exists in significant numbers in the regional economy.  A separate judgment shall be entered in conjunction with this Memorandum and Order.  The Clerk's Office is directed to close this case for statistical purposes.

DATED this 12th day of March, 2007.

BY THE COURT:


s/Joseph F. Bataillon
JOSEPH F. BATAILLON
Chief United States District Judge

26